UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

TOMMIE L. CARTER,

                    Plaintiff,

v.                                                 Case No. 17-cv-1297-pp

JUSTIN MAHER,

                    Defendant.

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 49), DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 56) AND DISMISSING CASE**

      The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983, alleging that the defendant violated his constitutional rights. Dkt. No. 1. On October 10, 2017, the court issued a screening order, allowing the plaintiff to proceed on an Eighth Amendment deliberate indifference claim that defendant Justin Maher failed to allow him access to his albuterol inhaler. Dkt. No. 10. On June 29, 2018, the defendant filed his motion for summary judgment, dkt. no. 49, and the plaintiff filed his motion on July 11, 2018, dkt. no. 56. The court will grant the defendant's motion for summary judgment and deny the plaintiff's motion.

**I.**     **RELEVANT FACTS**

      The court takes the relevant facts primarily from the plaintiff's proposed findings of fact, dkt. no. 59, and the defendant's proposed findings of fact, dkt. no. 51. The plaintiff was housed at Green Bay Correctional Institution at the time

of the events that gave rise to this case. Dkt. No. 51 at ¶1. The defendant was employed at Green Bay as a correctional officer during that time. Id. at ¶2.

On May 28, 2017, the defendant was working the Control Center in the Restrictive Housing Unit. Id. at ¶4. Part of his duties while working in the Control Center included using video cameras to monitor the unit's operations; controlling access to the unit; operating the automatic cell doors; safeguarding equipment; and coordinating staff responses to situations that occurred on the unit. Id. at ¶5. The defendant states that he was not allowed to leave the Control Room while on duty. Id. at ¶6.

Neither party disputes that at 11:15 p.m., the plaintiff used the emergency intercom system to contact the defendant to request his albuterol inhaler. Id. at ¶9; Dkt. No. 59 at ¶1. The plaintiff states that he also informed the defendant that he was having an asthma attack, dkt. no. 59 at ¶1, but the defendant claims that the plaintiff only requested his inhaler, dkt. no. 51 at ¶¶9-10. The defendant indicates that under control center protocol, he notified the wing officer on his radio that the plaintiff had requested his inhaler and that the plaintiff wanted the supervisor to know of the request. Id. at ¶¶10, 13. According to the defendant, because the guard on duty in the control center cannot leave his post, that guard dispatches other unit officers—in this case the wing officer—to respond to inmates emergencies. Id. at ¶13. The wing officer is responsible for taking any additional measures to address the inmate's concerns and to get the supervisors involved. Id. at ¶¶11, 14.

The plaintiff disputes that the defendant notified anyone that he needed his inhaler. Dkt. No. 59 at ¶2. It is undisputed, however, that later in the evening, Lt. Cushing, a unit supervisor who is not a defendant, checked on the plaintiff. Dkt. 58 at ¶17. The parties dispute what the plaintiff and Cushing discussed. The defendant states that Cushing told the plaintiff that he would get the plaintiff's inhaler, but that the plaintiff told him not to. Dkt. No. 51 at ¶18. The plaintiff contends that Cushing never said he would get the plaintiff's inhaler and that he was checking on the plaintiff because he thought the plaintiff was harming himself. Dkt. No. 58 at ¶¶16-17. The plaintiff also disputes that he told Cushing that he did not need his inhaler and asserts that he told Cushing about the asthma attack, including the fact that he passed out and hit his head. Dkt. No. 58 at ¶¶ 18-20. According to defendant, the plaintiff never told Cushing about passing out and hitting his head. Dkt. 51 at ¶19. Regardless, the defendant states that after he involved the wing officer, he had no personal knowledge of what happened between the plaintiff and unit staff who responded to the defendant's notification. Id. at ¶21. The defendant further states that the plaintiff never notified him of the asthma attack, the fall or the head injury. Id. The plaintiff contends that in addition to his original request for his inhaler, he used the intercom again to inform the defendant of his asthma attack and hitting his head. Dkt. No. 58 at ¶21.

3

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B. The Court's Analysis

1. *Deliberate Indifference to a Substantial Risk of Serious Harm*

a. Standard

The Eighth Amendment, made applicable to the States by the Fourteenth Amendment, prohibits the "unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 104 (1976). Prison officials violate the Eighth Amendment where they show "deliberate indifference" to a substantial risk of serious harm to an inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834-35 (1994). An "objectively serious medical condition" can create a substantial risk of serious harm to an inmate's health or safety. Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011). A medical condition is objectively serious where it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." King v. Kramer, 680 F.3d 1013, 1018 (7th Cir. 2012) (internal citations omitted).

To determine whether a prison official was deliberately indifferent to an objectively serious medical condition, the court must consider the prison official's subjective state of mind. See Petties v. Carter, 836 F.3d 722, 728 (7th Cir. 2016). To succeed in proving that an official acted with deliberate indifference, "a plaintiff must provide evidence that an official *actually* knew of and disregarded a substantial risk of harm." Id. (emphasis in original). "It is well established that 'showing mere negligence is not enough' for a deliberate indifference claim." Chatham v. Davis, 839 F.3d 679, 685 (7th Cir. 2016) (quoting Petties, 836 F.3d at 728).

5

b. Substantial Risk of Serious Harm

Courts frequently have found that asthma is a serious medical condition. See Gray v. Hardy, 826 F.3d 1000, 1006-07, (7th Cir. 2016); Chatham, 839 F.3d at 684; Board v. Farnham, 394 F.3d 469, 484 (7th Cir. 2005). The court finds for the purposes of this decision that the plaintiff's asthma constituted a serious medical condition.

c. Whether the Defendant Knew the Plaintiff Was Having an Asthma Attack

The parties dispute whether the defendant knew that the plaintiff was having an asthma attack at the time the plaintiff contacted him and asked for the inhaler. In his sworn affidavit, the defendant attests that he had no knowledge about whether the plaintiff was actually having an asthma attack at the time the plaintiff asked for the inhaler. Dkt. No. 52 at ¶10. He indicates that inmates "often feign emergencies to get staff to come to their cells." Id. The defendant states that because he couldn't leave the control center, it would have been the responding officer's job to check on the plaintiff. Id. In contrast, the plaintiff attests, in his unsworn declaration filed under 28 U.S.C. §1746, that when he first contacted the defendant on the intercom, he asked for his inhaler, "advising [the defendant] that [he] was having an asthma attack and could not breathe." Dkt. No. 60 at ¶4. He asserts that the defendant "was placed on notice by [the plaintiff] multiple times that [the plaintiff] needed [his] inhaler because [the plaintiff] was unable to breathe and was having an asthma attack." Id. at ¶15.

> d. Whether the Defendant Notified Anyone that the Plaintiff Had Asked for His Inhaler

Assuming, for the sake of this decision, that a jury were to resolve this factual dispute in favor of the plaintiff and conclude that the defendant knew the plaintiff was having an asthma attack at the time he first contacted the defendant, the parties next dispute whether the defendant contacted anyone to report that the plaintiff had asked for his inhaler.

> > i. **Facts from the defendant**

The defendant swears in his affidavit that at 11:15 p.m. on May 28, 2017, he documented in the log book that the defendant had asked for his inhaler. Dkt. No. 52 at ¶7. The defendant attests in the affidavit that after recording that information in the log, he "notified the wing officer on his radio that [the plaintiff] requested his inhaler and wanted a supervisor to know." Dkt. No. 52 at ¶8.

The defendant attached to the affidavit a page which he identified as "Intercom Log." Dkt. No. 52-1. The left side of the document is cut off—one can see the digit "28" in the far-left column. In the column marked "Time" someone wrote "11:15." In the column marked "Cell," one can see the number 536.[1] In the column for initials, one sees the defendant's initials—"JM." The next column contains the following: "Inhaler?" There is something illegible in the next column to the right. Id.

---

[1] The plaintiff testified at his deposition that he was in Cell 536 that night. Dkt. No. 53-1 at 8 (Tr. P. 32).

The defendant also attached a document which he identified as "Unit Logbook." Dkt. No. 52-2. This document contains more detail. It recounts events going on in the unit on May 28, 2017. There is a notation at "0005" that reads as follows: "SGT Record: Usual meal questions [redaction] wants me to pass pictures to [redaction]—No 536 CARTER says he wants his inhaler, talked to Lt. about it . . . ." Id. at 1.

Finally, the defendant attached an affidavit from Cushing. Dkt. No. 54. Cushing attested that he spoke with the plaintiff in his cell "late in the evening on May 28, 2017, after being notified that he had requested his inhaler." Id. at ¶6. Cushing attested that he did not recall who told him that the plaintiff needed the inhaler; it would have been one of the officers working on the wing. Id. Cushing asserted that there had been a "mix-up" in the restrictive housing unit regarding the plaintiff's inhaler—the security staff thought he was medically restricted from keeping his inhaler in his cell with him, but Cushing said there actually was no such restriction. Id. at ¶8. Cushing says that when he learned that the plaintiff wanted his inhaler, Cushing went to the plaintiff's cell to explain the mix-up. Id. He says that he offered to get the plaintiff's inhaler for him, but that the plaintiff "then stated he did not need it." Id. Cushing also attested that the plaintiff didn't mention anything about passing out or hitting his head and did not appear to be in medical distress. Id. at ¶9.

ii. **Facts from the plaintiff**

The defendant provided the court with the transcript of the plaintiff's deposition, taken on May 22, 2018. Dkt. No. 53-1. The plaintiff testified at the

8

deposition that he knew the defendant "did not call anybody because if he would have called someone, they would have came to my door." Dkt. No. 53-1 at 3 (Tr. p. 10). He repeated this rationale several times, arguing to defense counsel that if the defendant had told someone the plaintiff had asked for his inhaler, someone would have come to the plaintiff's cell.

Counsel then walked the plaintiff through everything he remembered from that night. The plaintiff said that he pushed the intercom button, the defendant answered, and the plaintiff "informed him that [the plaintiff] needed [his] inhaler and [the plaintiff] was having difficulties breathing." Id. (Tr. p. 12). The plaintiff said no one came, so he pressed the button again; the defendant answered, no one came. Id. He said that other inmates pressed the emergency button, because the plaintiff told those other inmates he couldn't breathe, but no one came. Id. The plaintiff said that "early" the next morning, "like maybe one or two," Cushing came to the plaintiff's door to ask what was going on, and the plaintiff told Cushing that he needed his inhaler. Id. at 4 (Tr. p. 13). The plaintiff thought Cushing came to his cell two and a half or three hours after he contacted the defendant. Id. at 8 (Tr. pp. 31-32). According to the plaintiff, Cushing "said nobody told him that [the plaintiff] needed [his] inhaler." Id. The plaintiff testified that he believed Cushing came to his cell because Cushing believed the plaintiff might have been trying to harm himself. Id. at 6 (Tr. p. 24). The plaintiff testified that, despite telling Cushing he needed the inhaler, he never received the inhaler that night. Id.

9

Sometime the next morning, the plaintiff asked to see the Health Services Unit, and he indicated that the unit did see him and give him an emergency inhaler to have in his cell. Id. at 4 (Tr. pp. 13-14). He also told the HSU that he had passed out and hit his head on the ground. Id. (Tr. p. 14). The plaintiff indicated that when he passed out and hit his head, he got a "knot on the back of [his] head." Id. at 9 (Tr. p. 33); 4 (Tr. pp. 14-15).

At his deposition, the plaintiff testified that he never refused the inhaler. Dkt. No. 53-1 at 4 (Tr. p. 13). He testified that he believed Cushing had mentioned something to him about there having been a mix-up with his inhaler, but he stated that he "believe[d]" that Cushing had mentioned that "[a]fter the fact," "a day or so later." Id. at 7 (Tr. pp. 26-27). The plaintiff testified that Cushing mentioned the mix-up only after the plaintiff had filed an inmate complaint about the inhaler incident. Id. (Tr. p. 27).

The plaintiff reiterated in his unsworn declaration that the defendant "never notified anyone that I needed my inhaler." Dkt. No. 60 at ¶5. He asserts that the defendant "never notified the range officer over the radio that [the plaintiff] needed [his] inhaler," and asserts that "[t]here is no documented evidence that would support that [the defendant] notified anyone of the situation other than word of mouth from [the defendant] himself." Id. at ¶13. He asserts that the defendant "did not notify the (John Doe or Jane Doe) wing officer that [the plaintiff] requested [his] inhaler," id. at ¶29, and claimed again that he told the defendant "more than once" that he needed his inhaler, id. at ¶30.

10

### iii.   **Comparison of the evidence**

The defendant has provided three pieces of evidence to support his claim that he told someone the plaintiff had asked for his inhaler: (1) his sworn affidavit, (2) Cushing's sworn affidavit (attesting that he went to the plaintiff's cell because someone had told him the plaintiff had asked for his inhaler), and (3) the page from the unit log in which the defendant wrote that the plaintiff asked for the inhaler and that the defendant "talked to Lt. about it." The plaintiff has presented one piece of evidence to support his claim that the defendant did not tell anyone that the plaintiff had asked for his inhaler: his §1746 declaration. That declaration matches the plaintiff's testimony at his deposition (testimony provided by the defendant). The record contains evidence supporting both versions of events.

Standing alone, the fact that his own declaration is the only evidence the plaintiff submitted does not mean that he cannot survive summary judgment. The Seventh Circuit has held, more than once, that "a self-serving affidavit is an acceptable method for a non-moving party to present evidence of disputed material facts," if that affidavit meets "the usual requirements for evidence presented on summary judgment." Payne v. Pauley, 337 F.3d 767, 773 (7th Cir. 2003); see also Widmar v. Sun Chemical Corp., 772 F.3d 457, 459-60 n.1 (7th Cir. 2014). The question is whether the plaintiff's declaration (and his deposition testimony) meet those usual requirements, "including the requirements that [the evidence] be based on personal knowledge and that [the evidence] set forth

11

specific facts showing that there is a genuine issue for trial." Id. They do not meet those requirements.

The plaintiff's insistence that he "knows for a fact" that the defendant did not tell anyone he asked for his inhaler is not based on personal knowledge. The deposition testimony shows that the plaintiff's claim that he "knows" that the defendant did not contact anyone is not based on his observations of the defendant.

Defense counsel asked the plaintiff during his deposition whether, when the intercom was not on, the plaintiff could hear conversations going on in the bubble. Dkt. No. 53-1 at 3 (Tr. pp. 9-10). The plaintiff responded that he didn't know, that he wasn't sure. Id. When defense counsel followed up by asking whether the plaintiff heard the defendant do anything in response to the plaintiff's intercom call, the plaintiff responded, "Well, I can't hear him doing anything. I mean, as far as me seeing him, I didn't see him do anything." Id. (Tr. p. 10). Defense counsel then asked, "But you don't know whether he called somebody, right?" Id. The plaintiff responded, "He did not call anybody because if he would have called someone, they would have come to my door." Id. Defense counsel narrowed the question, asking, "You don't know if he called somebody to come to your cell based upon your intercom call, correct?" Id. The plaintiff reiterated that if the defendant had called someone, someone would have come to his cell. Defense counsel tried again: "[Y]ou don't know whether he called somebody or not. That person could have forgotten about it and not come to your cell." Id. The plaintiff responded, "No, that's absolutely false. If he would have let

them know that Tommie Carter needed his inhaler, they would have absolutely, 100 percent for sure come to my cell door because they know my reputation." Id. When defense counsel asked the plaintiff whether there was any "possible way" that the defendant could have relayed the information to anyone else, and the information just got lost, the plaintiff responded, "I don't believe he informed no one." Id. (Tr. p. 11). Defense counsel countered, "You don't believe so but you don't know so, correct?" The plaintiff replied, "I don't believe so, I don't know so. Again, if he had informed them, they would have came to my door." Id.

Defense counsel then came at the issue from a different angle, asking whether the plaintiff was in "the bubble" when the defendant received the plaintiff's intercom call. Id. The plaintiff responded, "I wasn't in the bubble, I was in my cell." Id. The following exchange occurred:

> Q: And you can't hear what's going on in the bubble and who [the defendant] talked to after your intercom call, right?
>
> A. Yeah, but that ain't how it works, though. Because if he would have talked to anybody, you would have heard the door opening or he would have called on the little thing, it's like a PA system. He would have been like emergency in Cell 536 or 5 or whatever, whatever, you would have heard that over the PA system and that did not happen.
>
> Q: Does it have to be over the PA system if somebody's going to use a personal radio?
>
> A: Well, it would be a misuse of the radio considering that there was something that was allegedly going on at the time with another inmate.

Id. (Tr. pp. 11-12).

13

Toward the end of the deposition, the plaintiff again insisted that he "[knew] for a fact that [the defendant] did not inform anybody that [the plaintiff needed his] inhaler." Id. at 8 (Tr. p. 35). This prompted the following exchange:

> Q: When you say you know for a fact he didn't tell anybody, that's not accurate, is it? You weren't in the room with them, were you?
>
> A: No, no, no, no, no; see, you always trying to twist things. I said I know for a fact that [the defendant] did not tell anyone that I needed my inhaler. I know for a fact he didn't because if he would have told these people that Tommie Carter, the so-called troublemaker, the so-called guy that's on a 60-day rotation for misbehaving, needed his inhaler, they would have brung my inhaler. I know that were a fact. I know you don't know this but I do because you don't deal with these people every day, I do, not you.
>
> Q: Were you outside of your cell next to [the defendant] that evening for the entire time between when you pressed the intercom button and when you eventually spoke to Lieutenant Cushing?
>
> A: I didn't know you was a comedian. Are you being funny?
>
> Q: No, I'm asking you because you said you know for a fact. But I'm going to argue on summary judgment that you are speculating as to what Officer Maher did; you were not near him.
>
> A: Well, you can do whatever you want. But I know for a fact because if he would have informed this—where is the evidence that he informed them, his word or mine? His word?
>
> Q: Mr. Carter—
>
> A: I'm asking you a question.
>
> Q: —I'm not going to argue over this. This is a deposition, I get to ask the questions. You have no personal knowledge of what he did or did not do, so you cannot testify that he didn't do something when you weren't there.

> A: Sure.
>
> Q: I'm trying to establish you were not with [the defendant] when he was making decisions and talking to people that evening, correct?
>
> A: Once again, he did not inform nobody. Whether you want to flip it and try to say he did or I don't know, I'm using common sense and logic common sense that he did not inform no one because if he did, I would have got my inhaler and we wouldn't be sitting here going back and forth, back and forth, you playing psychological games in an attempt to try to create a story that doesn't exist.
>
> Q: Mr. Carter—
>
> A: I can year you very fine.
>
> Q: —again, were you with [the defendant] from the time period that you pressed your intercom button until you talked to Lieutenant Cushing? Were you with him that entire period?
>
> A: That's a stupid question because I just answered you; I was in my cell.
>
> Q: Okay. So you were not with [the defendant], correct?
>
> A: No, I was not with him.
>
> Q: Okay.

Id. at 9-10 (Tr. pp. 35-37).

This testimony shows that the plaintiff could not have observed the defendant at the time he contacted the defendant or in the minutes that followed. The plaintiff admitted that he was in his cell and that the defendant was in the control center. The plaintiff's insistence that he "knows for a fact" that the defendant did not contact anyone is not a fact. It is an inference he drew from a fact and a belief: the *fact* that no one responded immediately to his request for an

15

inhaler and the *belief* that, based on his "reputation," had the defendant informed anyone about the plaintiff's request, someone would have appeared at the plaintiff's cell immediately.

Perhaps the plaintiff did have a reputation at the facility. Perhaps, in the past, when he'd requested medical help, he'd received it immediately. Perhaps the plaintiff had reason to assume that, if the defendant had contacted someone to report the plaintiff's request, someone should have appeared quickly. But the court has no evidence of any of that. The court can consider the plaintiff's declaration as evidence sufficient to create a genuine issue of material fact only if is based on personal knowledge. His assertion that the defendant did not contact anyone is not based on personal knowledge, and it is not sufficient to create a genuine issue of material fact as to whether the defendant contacted anyone.

The only evidence before the court that meets the usual requirements for evidence presented on summary judgment is the defendant's evidence—his affidavit (based on his own personal experience and knowledge) that he notified someone about the plaintiff's request, the unit log in which he wrote that he notified someone of the plaintiff's request and Cushing's declaration (based on Cushing's personal knowledge) that he went to see the plaintiff because someone had notified him that the plaintiff had asked for his inhaler.

The evidence showing that the defendant notified someone that the plaintiff asked for his inhaler proves, as a matter of law, that the defendant was not deliberately indifferent to the plaintiff's serious medical risk. Even assuming the plaintiff did tell the defendant that he was having an asthma attack and couldn't

16

breathe, the defendant did something about it. He did not ignore the plaintiff. He notified the wing officer. That is not deliberate indifference.[2]

2. *Qualified Immunity*

The defendant also argued that he was entitled to qualified immunity. Dkt. No. 50 at 8. Because the court grants summary judgment on the merits, the court does not reach the qualified immunity argument.

### III. CONCLUSION

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 49.

The court **DENIES** the plaintiff's motion for summary judgment. Dkt. No. 56.

The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See

---

[2] The plaintiff disputed many other facts proposed by the defendant. He disagrees that someone assigned to the bubble can't leave it; he asserts that guards assigned to the bubble (including the defendant) leave all the time to chat with each other and at inmate's cells and to do other things. He disputes the reason for Cushing coming to see him. He disputes whether it was the wing officer's responsibility to check on inmates. He disputes whether the defendant should have made sure someone came to the plaintiff's cell immediately. He disputes what should have been done about the "mix-up" regarding him having his inhaler in his cell. These disputes are not relevant to the ultimate question of whether, in this case, there is evidence to show that the defendant—who was undisputedly in the bubble at the time of these events—contacted someone to report the plaintiff's request for an inhaler.

17

Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 11th day of January, 2018.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**